UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x

XAVIERA ROMERO,

        Plaintiff,

        -against-

ST. VINCENT'S SERVICES, INC., d/b/a
HEARTSHARE ST. VINCENT'S
SERVICES,

        Defendant.
----------------------------------------------------x

Civil Action No. 1:19-cv-07282 (KAM)(ST)

**CORRECTED STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1**[1]

Defendant St. Vincent's Services, Inc. d/b/a HeartShare St. Vincent's Services ("HSVS" or "Defendant") as and for its statement of material facts as to which there is no genuine issue to be tried, pursuant to Rule 56.1 of the Local Rules of this Court, alleges as follows:

**I.    Background Concerning HSVS**

1.    HSVS is a not-for-profit human services agency that serves individuals, children and families to assist them with overcoming the challenges of family crises, addiction, mental illness and poverty. DS: 10:20-11:13.

2.    HSVS is an affiliate of HeartShare Human Services of New York ("HeartShare"). DS: 19:5-7.

---

[1] The citations to the deposition transcripts have been corrected to comply with the Court's rules requiring a Joint Deposition Transcript Appendix. Citations to Plaintiff's deposition transcript are referred to as "P: ___." Citations to Saffayeh's deposition transcript are referred to as "DS: ___." Citations to Alexandre's deposition transcript are referred to as "JA: ___."

1

3. HSVS maintains an Employee Handbook that contains "Equal Employment and Harassment Policies," among other employment policies. P: 26:7-22; DS: 38:8-39:4; Toren Aff., Ex. 3[2].

## II. Plaintiff's Employment at HSVS

### A. Plaintiff is Hired by HSVS

4. Romero commenced employment at HSVS on or about September 6, 2016. P: 22:14-16; Toren Aff., Ex. 4.

5. Saffayeh was involved with the decision to hire Romero. DS: 19:23-25.

6. Romero received HSVS's Employee Handbook in or around the time that she commenced employment at HSVS. P: 26:7-22; DS: 38:8-39:4; Toren Aff., Ex. 3.

7. Plaintiff's title at the time that she commenced employment at HSVS was Director – Mental Health Clinics at HSVS. P: 27:5-23; Toren Aff., Ex. 4.

8. Plaintiff's role at HSVS was within HSVS's Integrated Health Services Division. P: 27:4-28:3; Toren Aff., Ex. 4.

9. Romero's supervisor at the time of her commencement of employment at HSVS was Jennifer Outlaw ("Outlaw"), the Senior Vice President of Integrated Health Services. P: 32:18-20; DS: 20:16-20.

10. Outlaw had previously supervised Plaintiff at a prior employer. P: 24:2-21.

11. Outlaw's supervisor was Dawn Saffayeh ("Saffayeh"), Executive Director of HSVS. P: 33:8-34:6; DS: 10:8-10.

---

[2] References are to the Affirmation of Stefanie Toren, Esq. in Support of Defendant's Motion for Summary Judgment, dated November 5, 2021 ("Toren Aff.").

2

**B.     Background Concerning HSVS's Integrated Health Services Division and Plaintiff's Role Within the Division**

12.     During the period that Plaintiff worked at HSVS, HSVS's Integrated Health Services Division consisted of approximately four programs. The first program concerns HSVS's mental health clinics that are licensed by the New York State Office of Mental Health ("OMH") under Article 31 of the New York State Mental Hygiene Law ("Mental Health Clinics"). P: 28:12-21.

13.     The second program concerns HSVS's chemical dependency treatment program clinics that are licensed by the New York State Office of Alcoholism and Substance Abuse Services ("OASAS") under Article 32 of the New York State Mental Hygiene Law ("Chemical Dependency Clinics" and collectively with the Mental Health Clinics, the "Clinics"). P: 28:12-21, 38:7-21.

14.     The third and fourth programs are HSVS's health home program and care coordination program. P: 28:12-29:14.

15.     At the time Romero commenced employment, HSVS operated three outpatient Mental Health Clinics – one in Brooklyn, one in Queens and one in Staten Island. P: 36:22-37:7; DS: 48:22-51:9.

16.     As Director of the Mental Health Clinics, Romero was responsible for overseeing the day-to-day operations of these clinics, which included such responsibilities as supervising the supervisors, clinicians and psychiatrists at the clinics, providing support to the staff, overseeing staff productivity, scheduling, overseeing the physical office space, staffing, budget compliance, acting as a representative for HSVS at external meetings and working collaboratively with other HSVS divisions. P: 29:16-35:20; DS: 26:10-27:16; JA: 13:3-13.

17. At the time that Romero commenced employment, HSVS also operated three Chemical Dependency Clinics - one in Brooklyn, one in Queens and one in Staten Island. P: 38:22-25; DS: 48:22-51:9.

18. At the time Romero commenced employment, the Clinics were losing money. DS: 26:23-27:16, DS: 48:22-51:9.

19. In or about August 2017, Saffayeh was directed by HSVS's Board to reduce expenses in the Clinics in order to reduce the deficit. DS: 48:22-51:9.

20. HSVS made the decision to close three of the six Clinics as they continued to lose revenue. P: 40:4-23; DS: 48:22-51:9.

21. Effective on or about October 31, 2017, the Queens Chemical Dependency Clinic, the Staten Island Chemical Dependency Clinic and the Staten Island Mental Health Clinic were closed. P: 40:4-23; DS: 48:21-49:22.

22. HSVS also eliminated a director-level position in the Chemical Dependency Clinics. DS: 48:22-51:9.

23. HSVS made the decision to have Romero oversee the remaining three clinics – the Queens Mental Health Clinic, the Brooklyn Mental Health Clinic and the Brooklyn Chemical Dependency Clinic. P: 39:6-42:14; DS: 49:23-51:9.

24. Although Plaintiff was overseeing the same number of Clinics, Plaintiff was now responsible for dealing with two oversight agencies – OMH and OASAS. P: 39:6-42:14; DS: 49:23-51:9.

### III. Plaintiff's Performance Evaluation at HSVS

25. On or about August 1, 2017, Outlaw presented Plaintiff with an Annual Performance Evaluation. P: 83:3-87:18; Toren Aff., Ex. 5.

26. In this performance evaluation, Outlaw noted in the "Work Behaviors Section" that:

> **Needs**: Additional training, coaching and support, related to executive and change management. During this fiscal year, the staff have had to adjust to several changes in leadership and management style. The staff have had difficulty adjusting, and there have been some unsubstantiated Human Resources complaints.
>
> ***

Toren Aff., Ex. 5, p. 4.

27. Outlaw also noted in this section of the performance evaluation that:

> **Areas of Focus**: During Fiscal Year 2017-2018, Xaviera will complete a Strengths/Worked in Progress/Opportunities/Threats (SWOT) analysis to identify her management and leadership styles. She will also develop a strategic plan for how she will support the stability and growth of the clinic. She will learn more about management and leadership styles by attending workshops, discussing styles in supervisions and mentoring others transitioning.

Toren Aff., Ex. 5, p. 4.

28. Prior to receipt of Plaintiff's performance evaluation, Outlaw communicated to Plaintiff the importance of meeting financial targets in the Clinics so as to increase revenue. DS: 26:23-27:16; P: 107:4-109:14; Toren Aff., Ex. 5.

29. The performance evaluation reminded Plaintiff that "Next year, Xaviera will be responsible for meeting the set financial targets for the program." Toren Aff., Ex. 5, p. 5.

30. Romero's budgetary goals at this time were based on targets set by Saffayeh and Outlaw. DS: 37:11-19.

31. Plaintiff and Outlaw met monthly to discuss revenue projections. P: 107:4-109:14.

### IV. Employee Complaints Concerning Plaintiff

32. Multiple employees complained to HSVS concerning Plaintiff. P: 110:17-119:22.

33. Plaintiff was aware of at least five employees who complained about her. P: 110:17-119:22.

34. Saffayeh had either received complaints or was made aware of complaints about Plaintiff from Plaintiff's staff and other HSVS division-heads concerning Plaintiff's demeanor. DS: 53:17-54:40.

35. On or about February 4, 2017, Beth Wecksell, a Senior Psychologist at HSVS, submitted a complaint to HeartShare's Director of Human Resources concerning Plaintiff. Saffayeh Aff., Ex. A.[3]

36. On April 7, 2017, Joshua Levitt, a Licensed Mental Health Counselor at HSVS, submitted a complaint to HeartShare's Director of Human Resources concerning Plaintiff. Saffayeh Aff., Ex. B.

37. On or about January 27, 2018, Allison Kraus, a therapist at HSVS, submitted a complaint to HeartShare's Director of Human Resources concerning Plaintiff. Saffayeh Aff., Ex. C.

### V. Alexandre Becomes Plaintiff's New Supervisor

38. Outlaw left employment at HSVS in or about Spring 2018. P: 43:2-44:5; DS: 31:9-32:10.

---

[3] References are to the Affidavit of Dawn Saffayeh, sworn to on November 5, 2021, and annexed to the Affirmation of Stefanie Toren, dated November 5, 2021, as Exhibit 9.

39. In July 2018, Jude Alexandre ("Alexandre") became Romero's supervisor as the Vice President of Integrated Health Services. P: 43:2-44:5; DS: 31:9-32:10; JA: 7:17-19, 8:16-18.

40. During the period of time when Outlaw's position was vacant, Saffayeh supervised Plaintiff. DS: 31:22-25.

41. Plaintiff received a $5,000 raise in August 2018, the only raise she received during her employment at HSVS. P: 44:10-24.

42. Plaintiff received a $5,000 bonus in August 2018, the only bonus she received during her employment at HCS. P: 44:25-45:13.

43. Saffayeh made the decision to increase Plaintiff's salary and award her a bonus. DS: 48:16-51:16; JA: 52:17-19.

44. Saffayeh's decision was based on "an increase in workload" due to Plaintiff's agreement to oversee the remaining Chemical Dependency Clinic which required that Plaintiff work with a second oversight agency, OASAS. DS: 48:16-51:16; JA: 52:17-19.

45. At the time Plaintiff took on this added responsibility, Outlaw had requested a wage increase for Plaintiff based on her increased workload. Saffayeh was unable to grant the request due to budgetary reasons at the time. DS: 49:23-51:9.

46. Plaintiff had regular supervision meetings with Alexandre. P: 125:15-126:24; JA: 32:21-33:33:17.

47. Alexandre proposed to Saffayeh that HSVS refer the children in HSVS's foster care programs who require an initial mental health assessment to the Clinics. This would increase revenue and ensure compliance with requirements by New York City's Administration

7

for Children's Services ("ACS"), the agency that oversees HSVS's foster care program. JA: 34:2-12, 45:7-12; DS: 62:6-64:21.

48. Alexandre discussed this matter with Plaintiff. JA: 38:14-43:6; P: 136:8-137:22.

49. Alexandre discussed Plaintiff's refusal to implement this plan at the Clinics with Saffayeh. JA: 46:21-47:23; DS: 61:21-64:21.

50. Alexandre received employee complaints about Plaintiff's communication and attitude. JA: 54:20-55:19.

### VI. Plaintiff's Termination From Employment

51. On or about September 13, 2018, Alexandre received a complaint from one of HSVS's employees, Jason Meisel ("Meisel"), a Psychiatric Mental Health Nurse Practitioner, who was supervised by Romero. JA: 56:6-12; Saffayeh Aff., Ex. D.

52. Alexandre spoke with Meisel who complained that Romero had not approved his request to leave work early on the eve of Yom Kippur so that he could make it home for the holiday. Meisel also complained to Alexandre about how he and others were being treated by Romero. JA: 60:14-61:3; Saffayeh Aff., Ex. D.

53. Meisel forwarded to Alexandre his communications with Plaintiff on September 11 through 13, 2018. Saffayeh Aff., Ex. D.

54. In Plaintiff's last email to Meisel on September 13, 2018, Plaintiff wrote: "Just because you request time off does not automatically mean it gets approved." Toren Aff., Ex. J.

55. Plaintiff never approved Meisel's request to leave work early on the evening of Yom Kippur. JA: 69:21-70:2; Saffayeh Aff., Ex. D.

56. In the September 13, 2018 email to Alexandre, Meisel reported that Romero changed his schedule from when he was initially hired and that he was "extremely

micromanaged and got [sic] clear attempts to be made to feel [sic] childlike and inferior." Saffayeh Aff., Ex. D.

57. On September 13, 2018, Alexandre informed Saffayeh of Meisel's complaint via email. JA: 61:4-8; Saffayeh Aff., Ex. D.

58. On September 13, 2018, Saffayeh responded to Alexandre's email writing: "I am extremely concerned about Xaviera at this point. There have been many complaints in the past and now this if from a new highly respected physician." Saffayeh Aff., Ex. D.

59. A call was held the next day, September 14, 2018, between Saffayeh, Alexandre, HeartShare's Corporate Compliance Officer, Stan Capela ("Capela"), HeartShare's Human Resources Manager, Jose Vinluan ("Vinluan") and HeartShare's Special Assistant to the President & CEO, Hayley Cowitt, Esq. ("Cowitt") to discuss the latest complaint and whether Plaintiff's termination was warranted based on the pattern of behavior exhibited by Plaintiff. Outside counsel also participated in part of the conference call. DS: 78:2-79:2.

60. Saffayeh made the decision to terminate Plaintiff's employment. DS: 61:14-20.

61. The decision was made in consultation with Alexandre, Cutrona, Cowitt, Capela and Vinluan. DS: 61:14-20.

62. Saffayeh's reason for terminating Plaintiff's employment was based on her insubordination and poor treatment of employees as a manager. DS: 61:21-64:21.

63. Saffayeh believed that Plaintiff was insubordinate as she refused to implement a policy to conduct mental health assessments at the Clinics on every child who came into foster care at HSVS in accordance with ACS requirements. DS: 61:21-64:21.

64. Saffayeh also believed that Plaintiff's email to Meisel was "hostile." DS: 64:2-21, 78:5-79:2, 83:22-86:7, 90:12-23.

9

65. Saffayeh considered the fact that there had been many other complaints by employees against Plaintiff in connection with the decision to terminate Plaintiff's employment. DS: 64:2-21, 78:8-79:2, 83:22-86:7, 90:12-23.

66. On September 26, 2018, HeartShare's former Vice President of Human Resources, Michael Cutrona ("Cutrona") and Alexandre met with Romero and communicated HSVS's decision to terminate her employment effective September 28, 2018. P: 138:14-139:16; Toren Aff., Ex. 6.

67. Plaintiff's termination was confirmed in writing in a letter, dated September 26, 2018. P: 141:20-142:13; Toren Aff., Ex. 6.

68. Plaintiff's replacement is female. DS: 93:20-94:11.

### VII. Plaintiff's Allegations of Pregnancy Discrimination

69. On September 10, 2018, Plaintiff never communicated with Alexandre concerning the basis for her absence from work that day. P: 64:18-66:3.

70. On September 11, 2018, Plaintiff sent an email to Alexandre that she would be "out sick today." Plaintiff never communicated with Alexandre concerning the basis for her absence from work that day. P: 69:6-70:9; Toren Aff., Ex. 7.

71. On September 11, 2018, Plaintiff never informed Alexandre that she was undergoing fertility treatment. P: 69:6-70:9; Toren Aff., Ex. 7.

72. On September 11, 2018, Plaintiff sent an email to Alexandre which provides: "I am still not feeling well. I will not be in tomorrow. Thank you." P: 70:10-21; Toren Aff., Ex. 7.

73. On September 13, 2018, Plaintiff sent an email to Alexandre which provides: "I will not be in today. Thank you. I expect that tomorrow I will be able to make it in." P: 71:22-73:9; Toren Aff., Ex. 7.

74. On September 13, 2018, Plaintiff never informed Alexandre that she was undergoing fertility treatment. P: 71:22-73:9; Toren Aff., Ex. 7.

75. On September 17, 2018, Plaintiff never witnessed Alexandre open the envelope allegedly containing the September 11, 2018 letter from Dr. Jovana Lekovich of Reproductive Medicine Associates of New York, LLP (the "September 11 Note"). P: 78:4-6; Toren Aff., Ex. 8.

76. Plaintiff cannot recall if she told Alexandre that the September 11 Note was in the stack of papers that she had handed to Alexandre. P: 77:22-78:3.

77. Alexandre did not always read documents provided by Plaintiff to him. JA: 90:23-91:13.

78. On September 17, 2018, Plaintiff never witnessed Alexandre read the September 11 Note. P: 78:4-6, 82:24-83:2; Toren Aff., Ex. 8.

79. Alexandre never read the September 11 Note during Plaintiff's employment at HSVS. JA: 86:24-87:5.

80. As a practice, Alexandre does not request doctor's notes from his direct reports for sick day absences as a practice. JA: 89:12-90:7.

81. Other than Plaintiff's claim that she provided the September 11, 2018 Note to Alexandre, which HSVS denies, Plaintiff did not provide the September 11 Note to any other HSVS or HeartShare Human Services of New York ("HeartShare") employees. P: 80:12-24.

82. Plaintiff never informed Alexandre verbally or in writing that she was undergoing fertility treatments in August and September 2018. P: 80:25-81:5.

83. Plaintiff never informed Alexandre that she was undergoing a medical procedure on September 11, 2018. JA: 87:6-22.

84. During Plaintiff's employment at HSVS, Plaintiff never informed any employee of HSVS or HeartShare verbally or in writing that she was undergoing fertility treatments in August and September 2018. P: 81:6-17.

85. Plaintiff never informed Alexandre verbally or in writing that she was pregnant. P: 81:18-82:15.

86. During Plaintiff's employment at HSVS, Plaintiff never informed any employee of HSVS or HeartShare verbally or in writing that she was pregnant. P: 82:16-23.

87. The September 11 Note does not indicate that Plaintiff was pregnant. P: 81:22-82:9; Toren Aff., Ex. 8.

88. At no point did Romero advise Cutrona or Alexandre during the September 26, 2018 termination meeting that she was pregnant or undergoing fertility treatment. P: 140:25-141:20.

89. Plaintiff never informed Cutrona or Alexandre during this meeting or any time thereafter that she believed that she was terminated because of her pregnancy, perceived pregnancy or a pregnancy-related medical condition. P: 142:14-145:5.

90. Plaintiff contends that the pregnancy-related medical condition referenced in the Amended Complaint is Plaintiff's alleged pregnancy itself and not a separate pregnancy-related medical condition. P: 147:7-148:24.

91. Plaintiff did not witness anyone at HSVS make any remarks about Plaintiff's pregnancy or perceived pregnancy. P: 146:23-147:6.

Dated: New York, New York
November 5, 2021

                          Respectfully Submitted,

                          CLIFTON BUDD & DeMARIA, LLP
                          *Attorneys for Defendant St. Vincent's*
                          *Services, Inc. d/b/a HeartShare St. Vincent's*
                          *Services*

By: _____/s/ Stefanie Toren_____
                          Douglas P. Catalano
                          Stefanie R. Toren
                          350 Fifth Avenue, 61st Floor
                          New York, New York 10118
                          Phone: (212) 687-7410
                          Facsimile: (212) 687-3285
                          dpcatalano@cbdm.com
                          srtoren@cbdm.com